# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| **Jenifer Quinn**; and | Case No. 22-CV-369-_____ |
| | Case Type: Civil Rights / § 1983 |
| **A.D.** and **L.J.**, minors, by and through Jenifer Quinn, their grandmother and guardian, | |
| *Plaintiffs*, | |
| v. | **COMPLAINT** |
| | **(JURY TRIAL DEMANDED)** |
| **Patricia Doherty**, **Kathryn Joo**, **Christina Schultz**, **Mary Carey**, **David Hough**, and **Jodi Wentland**, each in their individual and official capacities; and | |
| **Hennepin County**, | |
| *Defendants*. | |

## INTRODUCTION

1.      The grandparent-grandchild relationship is commonly characterized by deep emotional bonds and is generally of great value to individuals and society. Constitutional precedent and the laws and rules of the State of Minnesota collectively emphasize the fundamental nature and importance of these cherished relations and buffer them from state interference.

2.      As Defendants sought to end the parental rights of three unfit parents, they took two young boys (ages four and six) from the loving and capable arms of their maternal grandmother—with whom the children had lived for most of their lives. Defendants then thwarted the grandmother's participation in the legal process and shuffled the boys between ten foster/shelter homes in less than two years. After terminating the parents' parental rights, Defendants sought to extinguish the grandmother's legal and emotional relationships with the boys by blocking her from seeing them and via permanent adoption by non-relatives.[1] Defendants were largely motivated—a court later observed—by their disparaging views of Grandma's past work as an exotic dancer.[2]

3.      Defendants forced the grandmother (Jenifer Quinn) to initiate separate legal proceedings that were almost entirely too late. While she was lucky to recover the boys (A.D. and L.J.) before they were adopted, Defendants' unlawful campaign harmed the family and deprived them of their rights to substantive and procedural due process. Plaintiffs now sue for redress.

---

[1] See Minn. Stat. § 257C.08, Subd. 5 (Grandparents' rights terminate upon non-family adoption).

[2] Cf. Smith v. Org. of Foster Fams. For Equal. & Reform, 431 U.S. 816, 834–35 (1977) ("Studies also suggest that social workers of middle-class backgrounds, perhaps unconsciously, incline to favor… a bias that treats the natural parents' poverty and lifestyle as prejudicial to the best interests of the child. This accounts, it has been said, for the hostility of agencies to the efforts of natural parents to obtain the return of their children.") (cleaned up).

## JURISDICTION AND VENUE

4.     Plaintiffs incorporate each of the preceding and subsequent paragraphs as if fully set forth herein and throughout.

5.     The Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because certain of Plaintiffs' claims are based on federal law—specifically the United States Constitution and 42 U.S.C. § 1983. Further, the parties are residents of this State and District, and the unlawful practices alleged herein occurred in this State and District.

6.     This Court has personal jurisdiction over Defendants because each defendant resides and does business within this State and District.

7.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the claims arose in this District and Defendants reside in this District.

8.     This Court has supplemental jurisdiction over Plaintiffs' state law claims because those claims arise from—and form part of—the same case and controversy as Plaintiffs' federal claims.

## PARTIES

9.     Plaintiffs incorporate each of the preceding and subsequent paragraphs as if fully set forth herein and throughout.

10.    Plaintiff Jenifer Quinn is a resident of Clark County, Nevada. Quinn is the legal guardian and biological grandmother of the minor Plaintiffs.

11.    Plaintiff A.D. is a minor resident of Clark County, Nevada and appears by and through his grandmother and legal guardian, Jenifer Quinn.

12.    Plaintiff L.J. is a minor resident of Clark County, Nevada and appears by and through his grandmother and legal guardian, Jenifer Quinn.

13.    Defendant Patricia Doherty is, upon information and belief, a resident of Minnesota. At times material hereto, Doherty has worked under color of state law and within the course and scope of her employment as a Social Worker for Hennepin County. In that capacity, Doherty has had duties that include, but are not limited to:  complying with Minnesota laws and rules regarding juvenile protection and custody; complying with clearly-established constitutional rights of children and their family members; and exercising proper and good-faith professional judgment lacking deliberate indifference and without committing willful and malicious wrongful acts.

14.    Defendant Kathryn Joo is, upon information and belief, a resident of Minnesota. At times material hereto, Joo has worked under color of state law and within the course and scope of her employment as an Adoption Resource

Worker for Hennepin County. In that capacity, Joo has had duties that include, but are not limited to:  complying with Minnesota laws and rules regarding juvenile protection and custody; complying with clearly-established constitutional rights of children and their family members; and exercising proper and good-faith professional judgment lacking deliberate indifference and without committing willful and malicious wrongful acts.

15.    Defendant Christina Schultz is, upon information and belief, a resident of Minnesota. At times material hereto, Schultz has worked under color of state law and within the course and scope of her employment as a Social Worker for Hennepin County. In that capacity, Schultz has had duties that include, but are not limited to:  complying with Minnesota laws and rules regarding juvenile protection and custody; complying with clearly-established constitutional rights of children and their family members; and exercising proper and good-faith professional judgment lacking deliberate indifference and without committing willful and malicious wrongful acts.

16.    Defendant Mary Carey is, upon information and belief, a resident of Minnesota. At times material hereto, Carey has worked under color of state law and within the course and scope of her employment as a Social Worker for

Hennepin County. In that capacity, Carey has had duties that include, but are not limited to:  complying with Minnesota laws and rules regarding juvenile protection and custody; complying with clearly-established constitutional rights of children and their family members; and exercising proper and good-faith professional judgment lacking deliberate indifference and without committing willful and malicious wrongful acts.

17.    Defendant David Hough is, upon information and belief, a resident of Minnesota. At times material hereto, Hough has worked under color of state law and within the course and scope of his employment as County Administrator for Defendant Hennepin County. In that capacity, Hough has county-wide oversight and is responsible for the policies, practices, and operation of County agencies, and for Hennepin County's compliance with applicable state and federal law. Hough's oversight includes responsibility for Hennepin County Children and Family Services and Child Protection Services. Hough has had duties that include, but are not limited to:  ensuring compliance with Minnesota laws and rules regarding juvenile protection and custody; ensuring compliance with the clearly-established constitutional rights of children and their family members; and ensuring that County employees exercise proper

and good-faith professional judgment lacking deliberate indifference and malicious intent.

18.    Defendant Jodi Wentland is, upon information and belief, a resident of Minnesota. At times material hereto, Wentland has worked under color of state law and within the course and scope of her employments as Deputy County Administrator and Director of Human Services for Hennepin County. In those capacities, Wentland has had department- and county-wide oversight and is partly responsible for the policies, practices, and operation of County agencies, and for Hennepin County's compliance with all applicable state and federal law. Wentland's oversight includes responsibility for Hennepin County Children and Family Services and Child Protection Services. Wentland has had duties that include, but are not limited to: ensuring compliance with Minnesota laws and rules regarding juvenile protection and custody; ensuring compliance with the clearly-established constitutional rights of children and their family members; and ensuring that County employees exercise proper and good-faith professional judgment lacking deliberate indifference and malicious intent.

19.    Defendant Hennepin County is a Minnesota governmental entity subject to suit pursuant to Minn. Stat. § 373.01. At times material hereto,

Hennepin County served as the political and corporate body charged with control and supervision over all personnel of the Hennepin County Human Services & Public Health Department, which includes Children and Family Services and Child Protection Services—the departments charged with training and supervising the individual Defendants and with complying with the County's obligations to the Plaintiffs in this matter. All references to Hennepin County in this Complaint include each of its agencies, subdivisions, and departments, including but not limited to those aforementioned. Hennepin County is ultimately responsible for the policies, practices, and operations affecting the children in its custody and their families, and for ensuring: compliance with Minnesota laws and rules regarding juvenile protection and custody, compliance with the clearly-established constitutional rights of children and their family members, and that its employees exercise proper and good-faith professional judgment lacking deliberate indifference and malicious intent.

## BACKGROUND FACTS

20.     Plaintiffs incorporate each of the preceding and subsequent paragraphs as if fully set forth herein and throughout.

21.     A.D. and L.J. are brothers. They had different biological fathers, but

shared a biological mother—Precious Reese.[3] The boys were born in 2014 and 2012, respectively. Quinn is their maternal grandmother.

22.     Reese suffered from addiction and other mental health problems and often moved homes. As such, from their respective births until March 2016, the boys frequently lived with Quinn in her home, where they spent most of their time. Quinn was generally their primary caregiver, though Reese sometimes took the children away from her and occasionally threatened to keep them away.

23.     On March 3, 2016, A.D. was hospitalized and tested positive for opiates after Reese left him unsupervised with narcotics.

24.     On March 18, 2016, Reese traveled to Las Vegas and left the children in Quinn's custody.

25.     On March 21, 2016, Carey went to Reese's home to investigate a maltreatment report related to the March 3 hospitalization. Nobody was home, so Carey called Reese on the phone and learned that Reese was in Las Vegas. That same day, Carey met with Quinn, A.D., L.J., and A.D.'s father. Quinn was entirely forthcoming and transparent about her knowledge of—and relationship with—Reese and the boys.

---

[3] Reese passed away in 2019.

26.    On March 23, 2016, Carey spoke with Reese via phone and learned that Reese was still in Las Vegas. They also discussed the incident that led to A.D.'s hospitalization. That same day, Carey spoke with L.J.'s father via phone.

27.    On March 25, 2016, Defendants filed a petition for Child in Need of Protective Services ("CHIPS"). That same day, a Minnesota state court granted the petition and Defendants took the boys and placed them in foster care.

28.    Unbeknownst to Quinn, because the children had lived with her during the two years preceding the petition, the law guaranteed her the right to receive notice of the petition and to participate in—and automatically become party to—the juvenile protection proceedings. Minn. Stat. § 260C.163 (2016); Minn. R. Juv. Prot. P. 33.01, 33.02 and 34.01.[4]

29.    In violation of Minn. Stat. § 260C.221 and Minn. R. Juv. Prot. P.  27.04, 32.03, and 33.03,[5] Defendants did not inform the Court nor Quinn that Quinn had the right to participate and automatically become a party to the proceedings. Thus, the Court did not summon or otherwise send Quinn notice pursuant to

---

[4] The Rules of Juvenile Protection Procedure were amended in 2019 as part of a renumbering revision. During 2016–2018, Rules 33 and 34 were codified as Rules 22 and 23, respectively. The amendments did not substantively change the rules.
[5] During 2016–2018, Rules 27 and 32 were codified as Rules 38 and 21, respectively. The aforementioned amendments did not substantively change the rules.

Minn. Stat. §§ 260C.151 and 260C.152, and Minn. R. Juv. Prot. P. 44.[6,7] As a result, Quinn remained unaware of her rights as a grandmother and was not included as a party to the proceedings, nor was she otherwise allowed to advocate for her own relationship with the boys during the proceedings. Another significance was that Quinn remained unaware of the potential consequences of the proceedings, which included the possibility that her own relationship with the children could be legally and permanently terminated.

30. From the day Defendants first came to her home on March 21, 2016, Quinn consistently made clear that the boys had frequently lived with her and were never away from her for an extended period of time. She also made it abundantly clear that she wanted to resume caring for them in her physical custody and would also do anything necessary for legal guardianship.

31. Defendants rebuffed Quinn and told her that their sole focus was to reunify the children with their parents.

32. That was a lie. On March 30, 2016, Defendants required the boys' parents to sign a form that said Defendants were immediately moving forward

---

[6] During 2016–2018, Rule 44 was codified as Rule 32. The aforementioned amendments did not substantively change the rule.

[7] Exhibit 1 is a copy of the Summons/Notice that Quinn should have received.

with "concurrent permanency planning," which meant they already started looking for a permanent placement for the boys while also entertaining the possibility of reunification.

33.    In Spring and Summer 2016, Defendants told Quinn that if all parental rights were terminated, they would consider placing the boys with Quinn so long as she divorced her husband.[8] Quinn immediately confirmed that she would indeed divorce him if doing so was truly necessary to keep her grandchildren. In response, Defendants simply repeated their lie that such conversations were premature because Minnesota law required them to focus entirely on reunification.

34.    In May 2016, the boys were adjudicated in need of protection or services after Reese admitted that her chemical dependencies were negatively impacting her ability to parent.

35.    On December 23, 2016, Defendants filed a petition under Minn. Stat. § 260C to terminate the parents' parental rights.

36.    Still unbeknownst to Quinn, because the children had lived with her during the two years prior to the petition, the law guaranteed her the right to

---

[8] Defendants told Quinn that her husband had a disqualifying record. However, at the time of the filing of this Complaint, it is not clear if that assertion was truthful.

receive notice of the petition and to participate in—and automatically become

party to—the juvenile protection proceedings. Minn. Stat. § 260C.163, Subd. 2;

Minn. R. Juv. Prot. P. 33.02 and 34.01.

37.    In violation of Minn. Stat. §§ 260C.221 and 260.012, and Minn. R. Juv.

Prot. P.  27.04, 32.03, and 33.03, Defendants did not inform the Court nor Quinn

that Quinn had the right to participate and automatically become a party in all

proceedings related to the petition to terminate parental rights. Thus, the Court

did not summon or otherwise send Quinn notice pursuant to Minn. Stat. §§

260C.307, 260C.151, and 260C.152, and Minn. R. Juv. Prot. P. 53.[9] As a result,

Quinn remained unaware of her rights and was not included as a party to the

proceedings, nor was she otherwise allowed to advocate for her own relationship

with the boys during the proceedings. Another significance was that Quinn

remained unaware of the potential consequences of the proceedings, which

included the possibility that her own relationship with the boys could be legally

and permanently terminated.

38.    Between December 2016 and June 2017, Quinn continued to contact

Defendants and emphasize her desire for custody and guardianship in the event

---

[9] Exhibit 2 is a copy of the Summons/Notice that Quinn should have received.

that parental rights were terminated. Meanwhile, Defendants had been searching for permanent placement options other than Quinn since March 2016.

39.     In January 2017, as it became evident that Reese and the boys' fathers could likely lose their parental rights, Quinn separated from her husband. In April 2017, she filed for divorce. On May 4, 2017, the divorced was finalized.

40.     On May 24–25, 2017, a Minnesota state court held a trial on the County's petition to terminate all parental rights associated with the boys.

41.     On June 7, 2017, the court terminated all parental rights.

42.     Quinn immediately reiterated that she wanted to adopt the boys.

43.     Shortly thereafter, Defendants sent Quinn a one-page letter stating that they would not allow Quinn to adopt the children. In the letter:

    a. Defendants told Quinn that she hadn't filed for divorce quickly enough. However, as explained above, Defendants told her that they wouldn't consider her at all unless (and until) the children's parents lost their parental rights.

    b. Defendants also claimed that Quinn told the boys' guardian ad litem that she would divorce her husband and then have him move back in when the court matter concluded. However, as the guardian

ad litem later confirmed under sworn testimony, that wasn't true.

    c.  Especially disturbing, Defendants implied:

        i.  that Quinn's previous employment as an exotic dancer was really just code for prostitution;

        ii.  that Quinn hosted sex parties in her home—with minors; and

        iii.  that Quinn had sex with her daughter (Reese) and that Quinn tried to prostitute them together on Craigslist.

44.    As the Minnesota District Court later observed, Defendants' shockingly brazen suggestions had no merit and appeared to be based on Defendants' disparaging views of Quinn's past work as an exotic dancer.

45.    Minnesota law seeks to "preserve and strengthen the child's family ties whenever possible and in the child's best interests…" Minn. Stat. § 260C.001. Thus, while considering placement options, Minnesota law also required Defendants to prioritize relatives with whom the child had resided or had significant contact. Yet, Defendants completely refused to consider Quinn.

46.    In July 2017, after learning that Defendants never truly considered her requests for adoptive custody and were intent on ending her relationship with the children, Quinn hired a family law attorney who scrambled to file a

motion for adoptive placement. That effort was only necessary because Defendants prevented Quinn from advocating for her own relationship with the boys during the prior proceedings, effectively preventing her from having a meaningful opportunity to present her case and retain custody for more than a year. Also, it might have been far too late, as Defendants were simultaneously racing to find someone else to permanently adopt the boys.

47.   Meanwhile, throughout 2016–2018, Defendants continually placed the boys in less suitable homes, shuffling them between various foster and shelter homes. For example:

a.   Defendants placed the boys in a home of a woman who hid the fact that her nursing license was suspended for taking medication from a patient. Her fiancé was also convicted of domestic assault by strangulation and was legally not allowed to be in the home with the children. The couple repeatedly violated that law; nevertheless, Defendants considered her home as a permanency option. Then, police responded to a report that the man was making L.J. hold weights and do "wall squats." When the police responded, they initially encountered only the boys and the woman in the home.

The woman lied and said the man wasn't there; however, police then found him hiding in a crawl space.

b. Defendants placed the children in the home of a couple who:  1) each had convictions for assault and disorderly conduct, 2) would not submit to random drug tests as instructed by Defendants, and 3) would not get fingerprinted for licensing. Even more disturbing, Defendant Joo was aware of allegations that the man had sexually abused L.J., but she did not raise concerns. In fact, Defendant Joo even approved of the couple adopting the boys.

c. Another failed placement involved Defendants leaving the boys with a couple on a Friday with the intent that the couple would adopt the children. By Monday, the couple was reporting that they wanted the boys removed. On Tuesday, the couple brought the boys to daycare and later refused to pick them up.

48.    After Quinn filed her motion for adoptive placement, Defendants retaliated against her by blocking her from visiting the boys. Further, Defendants conspired with Therapist Paula Achenbach to perform a sham "parenting assessment," with the sole purpose of preventing Quinn from obtaining custody.

49.     On July 16, 2018, after Quinn and the boys had gone more than a year without seeing each other, a Minnesota state court granted Quinn adoptive placement. In its opinion, the court excoriated Defendants, Achenbach, and guardian ad litem Audrey Brown for their actions and omissions.

50.     Each of the Defendants was wrongful, negligent, or otherwise responsible in some manner for the events and happenings described herein, and proximately caused injury and damages to Plaintiffs. Each Defendant was jointly engaged in tortious activity, resulting in the deprivation of Plaintiffs' constitutional rights and other harm. Defendants were agents, servants, employees, partners, joint venturers, co-conspirators, and/or alter egos of other Defendants, and in doing the things herein alleged, were acting within the course and scope of those relationships. Defendants gave consent, aid, and assistance to the other Defendants and Hennepin County officials, and ratified and/or authorized the acts or omissions of other Defendants as alleged herein, except as otherwise specifically alleged.

51.     The acts and omissions of the Defendants in failing to ensure that Quinn was notified of her rights and properly included in juvenile protection proceedings was only possible because of the cover provided by the custom,

pattern, policy, practice, and procedures of Hennepin County. In violation of

Minn. Stat. §§ 260C.163, 260C.221, and 260.012 and Minn. R. Juv. Prot. P.  27.04,

32.03, and 33.03, Hennepin County regularly fails to notify the State District

Court and parties similarly situated to Quinn of the party's right to participate in,

and automatically become party to, juvenile protection proceedings.

52.    Plaintiffs collectively (and each individually) suffered injuries and

damages as a direct and proximate result of Defendants' unlawful conduct,

including but not limited to:  economic damages, mental and emotional pain,

short- and long-term emotional injury, dignitary harm, discomfort,

embarrassment, humiliation, fear, anxiety, apprehension, sleeplessness, a

generally diminished sense of personal and family safety, increased fear of

governmental authorities, and attorneys' fees and costs.

**COUNT I:**
**Procedural and Substantive Due Process**
**42 U.S.C. § 1983**
*As to the individual Defendants*

53.    Plaintiffs incorporate each of the preceding and subsequent

paragraphs as if fully set forth herein and throughout.

54.    The United States Constitution guarantees the fundamental right to

protection from government interference in intimate family associations. It also

guarantees the fundamental right to access/petition the courts.

55.     Furthermore, the Constitution guarantees the right to all process that is due in connection with those rights. In this case, that included a grandparent's right to intervene in child protection proceedings and the opportunity to receive notice of the right to be heard at a meaningful time and in a meaningful manner.

56.     Defendants deprived Plaintiffs of these rights by engaging in the conscious-shocking conduct alleged above.

57.     Defendants' deliberate indifference to Plaintiffs' rights were the result of Defendants' malice and/or reckless disregard.

58.     As a direct and proximate result of Defendants' conduct, Plaintiffs sustained—and continue to sustain—injury and damages.

59.     Defendant is liable to Plaintiffs for injuries/damages, and Plaintiffs are entitled to relief as set forth herein and to be further determined at trial.

**COUNT II:**
**Violations of Custom, Pattern, Policy, Practice, and/or Procedures**
<u>**Monell v. Dept. of Social Services**</u>
*As to Defendant Hennepin County*

60.     Plaintiffs incorporate each of the preceding and subsequent paragraphs as if fully set forth herein and throughout.

61.     Hennepin County, with deliberate indifference to the rights of

Plaintiffs and other similarly situated families, tolerated, permitted, failed to correct, promoted, or ratified the custom, pattern, policy, practice, and/or procedures that constitute a moving force behind the conduct and damages alleged in this Complaint.

62.   More specifically, Hennepin County regularly fails to notify the State District Court of the existence of individuals similarly situated to Quinn for the purposes of determining who shall receive notice of, and have the right to be included in, child protection proceedings. For example, Hennepin County child protection workers do not use template juvenile protection petitions, court notification forms, and/or pre-hearing reports that include fields for identifying applicable non-parent relatives. Yet, that is regular practice in other Minnesota counties.

63.   As a direct and proximate result of Hennepin County's acts and omissions, Plaintiffs sustained—and continue to sustain—injury and damages.

64.   Hennepin County is liable to Plaintiffs for injuries/damages, and Plaintiffs are entitled to relief as set forth herein and to be further determined at trial.

//

## COUNT III:
## Negligence
## Minnesota Common Law
### *As to all Defendants*

65.    Plaintiffs incorporate each of the preceding and subsequent

paragraphs as if fully set forth herein and throughout.

66.    Each Defendant owed Plaintiffs the duty to act with due care in the

execution and enforcement of any right, law, or legal obligation.

67.    Each Defendant owed Plaintiffs the duty to act with reasonable care.

68.    The general duties of reasonable care and due care owed to Plaintiffs

by each Defendant include but are not limited to those duties and responsibilities

as described herein.

69.    Defendants, by their acts and omissions, breached their duties and

responsibilities owed to Plaintiffs.

70.    Because many of the duties and responsibilities owed to Plaintiffs

were non-discretionary, Defendants are not entitled to official immunity.

71.    Hennepin County was negligent in failing to properly train and

supervise its employees in:

      a.   complying with Minnesota laws and rules regarding juvenile

         protection and custody;

    b.  complying with clearly-established constitutional rights of children and their family members; and

    c.  exercising proper and good-faith professional judgment lacking deliberate indifference and without committing willful and malicious wrongful acts.

72.    Under the doctrine of respondeat superior, Hennepin County is liable for the acts and omissions of their individual employees, including but not limited to the individual Defendants.

73.    As a direct and proximate result of Defendants' acts and omissions, Plaintiffs sustained—and continue to sustain—injury and damages.

74.    Defendant is liable to Plaintiffs for injuries/damages, and Plaintiffs are entitled to relief as set forth herein and to be further determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court:

Enter a judgment in favor of Plaintiffs and against Defendants, as follows:

1. An order granting Plaintiff judgment against Defendants;

2. An order granting Plaintiffs compensatory damages, in such amount as the jury may determine;

3.  An order granting Plaintiffs treble and punitive damages, in such

    amount as the jury may determine;

4.  An order granting Plaintiffs injunctive and declaratory relief;

5.  An order for Defendant to pay Plaintiffs' costs, interest and

    attorneys' fees;

6.  An order for Defendant to pay any and all further relief available,

    such as any relief this Court may consider equitable or appropriate.

*Plaintiffs demand a jury trial.*

Dated: February 8, 2022                    MADIA NEWVILLE LLC

                                           Joshua Newville, MN #395221
                                           1850 IDS Center, 80 S 8th St
                                           Minneapolis, Minnesota 55402
                                           newville@madianewville.com
                                           Phone: 612-349-2743