UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jenifer Quinn; A.D. and L.J., *minors, by and through Jenifer Quinn, their grandmother and guardian,*

        Plaintiffs,

v.

Patricia Doherty, Kathryn Joo, Christina Schultz, Mary Carey, David Hough, Jodi Wentland, and Katie Cleveland, *each in their individual and official capacities*; and Hennepin County,

        Defendants.

File No. 22-cv-369 (ECT/BRT)

**OPINION AND ORDER**

Joshua A. Newville, Madia Newville LLC, Minneapolis, MN, for Plaintiffs Jenifer Quinn, A.D., and L.J.

Steven Ross Gershone, Hennepin County Attorney's Office, Minneapolis, MN, for Defendants Patricia Doherty, Kathryn Joo, Christina Schultz, Mary Carey, David Hough, Jodi Wentland, Katie Cleveland, and Hennepin County.

       Plaintiff Jenifer Quinn is the maternal grandmother and guardian of minor children A.D. and L.J.  The seven individual Defendants were involved to varying degrees in Hennepin County District Court juvenile proceedings that resulted in the termination of parental rights of A.D. and L.J.'s parents and ultimately an order allowing Quinn to adopt the children.

       Quinn brought this case on her own and the children's behalf, alleging that Defendants violated Minnesota law by failing to give her adequate notice of, and an

opportunity to be heard in, the juvenile proceedings concerning A.D. and L.J., and that Defendants' Minnesota-law violations and other actions in connection with the juvenile proceedings amount to federal constitutional violations that injured her and the children. Plaintiffs assert procedural- and substantive-due-process claims under 42 U.S.C. § 1983. They seek to hold Hennepin County liable for the individual Defendants' assertedly unconstitutional actions under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Plaintiffs also assert a negligence claim against all Defendants under Minnesota law. For remedies, Plaintiffs seek injunctive and declaratory relief, damages, and attorney fees and costs.

Defendants seek dismissal of Plaintiffs' operative Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). The motion will be granted because Plaintiffs' allegations—though disheartening—do not plausibly show that Defendants' procedural missteps and unsupported positions taken in the child-custody proceedings rise to the level of constitutional violations.

I[1]

*March 2016 – A.D. and L.J. are the subject of a CHIPS petition.* A.D. and L.J. are half-brothers born in 2014 and 2012, respectively, to their shared biological mother,

---

[1]      In accordance with the standards governing a Rule 12(b)(6) motion, the facts are drawn entirely from Plaintiffs' Amended Complaint, *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014), or from public records and materials embraced by the Amended Complaint, *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 983 (8th Cir. 2008). Here, public records embraced by the Amended Complaint include prior court orders and judgments from the child-custody proceedings. *C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d 758, 764 (8th Cir. 2012).

Precious Reese.  Am. Compl. [ECF No. 5] ¶ 22.  Prior to her death in 2019, Reese "suffered from addiction and other mental health problems and often moved homes." *Id*. ¶ 23 & n.3. On March 3, 2016, then-one-year old A.D. was hospitalized and tested positive for opiates after Reese left him unsupervised.  *Id*. ¶ 24; *see also* ECF No. 11-1 Ex. 1 at 3–4.[2]  Later that month, on March 23, a Petition for Children in Need of Protective Services (or "CHIPS") was filed in Hennepin County Juvenile Court.  ECF No. 11-1 Ex. 1.  The petition was signed by Defendant Mary Carey, a Hennepin County social worker, on behalf of the Hennepin County Human Services and Public Health Department, and Lisa Godon, an Assistant Hennepin County Attorney.  The CHIPS petition identified Reese as the boys' biological mother, Treyvon Dudley as A.D.'s biological father, and Brandon Jensen as L.J.'s biological father.  *Id.* at 2.  The petition referenced hospital records indicating that A.D. was admitted "following accidental ingestion of (possibly) 2 OxyContin tablets, 10mg, as well as a 100mg Gabapentin pill" and tested positive for opiates the next day.  *Id.* at 3–4.  The Petition reported Reese's admission that A.D. ingested the drugs while she was not properly supervising the children.  *Id.*  The petition also described several other troubling facts regarding the boys' living situation with Reese.  *Id.* at 3.  The petition described in some detail that Reese had traveled to Las Vegas, Nevada, on March 18, and that Quinn had been caring for L.J.[3]  *Id.* at 4.  The petition described concerns regarding

---

[2]     For ease of reference, citations to filed exhibits are to ECF pagination and not to each document's separate pagination.

[3]     The CHIPS petition identified "Reese's mother" by the initials "J.R."  ECF No. 11-1 Ex. 1 at 4.  J.R. is understood in this context to refer to Quinn.

the situation in Quinn's home, including that, when the investigating social worker visited the home, L.J. "was only wearing underwear" and that Quinn's then-husband, "who reside[d] in the home, has an extensive criminal history, and at one point, was required to register as a predatory offender." *Id.* at 4, 5. The petition closed with a request for an adjudication that A.D. and L.J. require "protection or services and a disposition pursuant to" Minn. Stat. § 260C.201, subdiv. 1. *Id.* at 7. Though "Quinn consistently made clear that the boys had frequently lived with her and never were away from her for an extended period of time," and "that she wanted to resume caring for them in her physical custody," Quinn did not receive notice of the CHIPS petition and "remained unaware of her rights as a grandmother" in connection with A.D. and L.J.'s custody, Am. Compl. ¶¶ 30–31. Quinn alleges that the failure to give her notice violated Minnesota law, specifically "Minn. Stat. § 260C.221 and Minn. R. Juv. Prot. P. 27.04, 32.03, and 33.03." Am. Compl. ¶ 30.

*March 30, 2016 – An emergency protective-care hearing is held on the CHIPS petition in Hennepin County District Court.* Several individuals appeared at this hearing: Assistant Hennepin County Attorney Godon; two social workers, one of whom was Defendant Carey; Reese and her attorney; a guardian ad litem appointed to represent the children's interests; Dudley; and Jensen. ECF No. 11-1 Ex. 2 at 11, 15. In an order entered following the hearing, a Hennepin County District Court Judge determined that "there are no services or efforts available which could allow the children to remain safely in [Reese's] home." *Id.* at 12. The order included requirements intended to address Reese's addiction and mental-health issues, including periodic drug testing. *Id.* at 13–14. Though the order noted that the Hennepin County Human Services and Public Health Department

4

recommended the children be placed "in relative foster care," the order does not identify the relative or relatives with whom the children were placed at that time.  *Id.* at 14.[4] Beginning around this time and continuing through the summer of 2016, "Defendants told Quinn that if all parental rights were terminated, they would consider placing the boys with Quinn so long as she divorced her husband."  Am. Compl. ¶ 34.  "Quinn immediately confirmed that she would indeed divorce him if doing so was truly necessary to keep her grandchildren."  *Id.*[5]

   *June 13, 2016 – The court enters an order for CHIPS adjudication and foster-care placement.*  This order followed a hearing on May 27, 2016, concerning the CHIPS petition.  This hearing was attended by Godon; social worker (and Defendant) Christina Schultz, Reese and her lawyer; Jensen and his lawyer; Dudley's lawyer (but not Dudley); a guardian ad litem; and Quinn.  ECF No. 11-1 Ex. 3 at 19.  The order noted that A.D. and L.J. had been in a "relative foster home" since March 30, but again did not identify the relative or relatives in whose care the boys had been placed.  *Id.* at 20.  The order declared the boys "to be children in need of protection or services[]" and transferred their "legal custody . . . to the Hennepin County Human Services and Public Health Department for placement in foster care."  *Id.* at 22.  The order included a finding that "[t]he Department

---

[4]    A subsequent order indicates that at least as of June 2017, "the children were in a relative foster placement with their paternal grandparents, Kathy and Melvin Jensen."  ECF No. 11-1 Ex. 8 at 84.

[5]    "In January 2017, as it became evident that Reese and the boys' fathers could likely lose their parental rights, Quinn separated from her husband.  In April 2017, she filed for divorce.  On May 4, 2017, the divorce was finalized."  Am. Compl. ¶ 40

has satisfied the relative search requirements under Minn. Stat. § 260C.221." *Id.* To support this finding, the order noted that "the Department provided Respondent mother [Reese] the opportunity to disclose the names and contact information for the children's relatives." *Id.* And the order noted that Department employees were "working to identify other relatives with whom the children could be placed." *Id.*

*December 23, 2016 – The Department files a petition to terminate parental rights.* This petition was attested to and signed by Defendant Schultz and signed also by Godon. ECF No. 11-1 Ex. 4 at 37. The petition described several grounds, including that Reese had failed to comply with court-ordered requirements entered following the March 30 emergency protective-care hearing. *Id.* at 29–30. Chief among these were Reese's failures to obtain mental-health care, her failure to appear for many drug tests, and her multiple positive drug tests. *Id.* The petition described comparable issues with the boys' fathers, Dudley and Jensen. *Id.* at 31–34. The petition noted that Reese had been residing with Quinn and Quinn's then-husband since the CHIPS proceedings had commenced. *Id.* at 30. However, the petition also noted that "[t]he Department does not consider this home to be a safe [sic] for the children because Respondent Reese's stepfather has a history of being a predatory offender." *Id.* "Defendants . . . did not inform the Court nor Quinn that Quinn had the right to participate and automatically become a party in all proceedings related to the petition to terminate parental rights." Am. Compl. ¶ 38. As a result, "the Court did not summon or otherwise send Quinn notice" of the petition, and Quinn remained unaware of her rights in, and the potential consequences of, proceedings on the petition. *Id.*

*January 3, 2017 – The Hennepin County District Court conducts a permanency hearing and enters findings and an order.*  The order entered following this hearing does not identify who was present or participated at the hearing (other than the assigned judge). ECF No. 11-1 Ex. 5 at 40, 44.  Quinn did not receive notice of this hearing and remained unaware of her rights with respect to the termination-of-parental-rights proceedings.  Am. Compl. ¶¶ 37–39.  The order noted that the Department's permanency plan for A.D. and L.J. contemplated either "[r]eunification with the parent" or "[t]ermination of parental rights to free the children for adoption."  ECF No. 11-1 Ex. 5 at 41.  However, the order also included findings that the Department was "[c]ompleting a relative search" and that, while the then-current caregiver was "the appropriate permanency resource for the children," the Department also had identified "[a] potential permanency resource from among the children's relatives."  *Id.* at 42.  The order did not identify the relative or relatives who might serve as a potential permanency resource.  *See generally id.*

*June 7, 2017 – The Hennepin County District Court enters an order terminating Reese, Dudley, and Jensen's parental rights as to A.D. and L.J.*  The order followed a trial that occurred over two days on May 24 and 25, 2017.  ECF No. 11-1 Ex. 6 at 46.  Several individuals appeared at the trial: Assistant Hennepin County Attorney Godon; Defendant Schultz; Reese and her attorney; Dudley and his attorney; Jensen and his attorney; and a guardian ad litem and her attorney.  *Id.*  The order noted that four witnesses testified during the trial: Reese, Defendant Schultz, the guardian ad litem, and Plaintiff Quinn.  *Id.* at 50. In its order, the court identified many reasons justifying crediting the testimony offered by Schultz and the guardian ad litem in support of the termination of parental rights.  *Id.* at

7

52–53.  The court also identified many reasons supporting its determination that "Reese's testimony lacked credibility and was self-serving and defied common sense."  *Id.* at 53; *see id.* at 54–55.  The order includes no description or findings regarding Quinn's testimony.  *See generally id.*  The court ordered Reese's parental rights—and, based on their consents, Dudley and Jensen's parental rights—terminated and appointed the Department as A.D. and L.J.'s guardian.  *Id.* at 73.  The court also ordered a hearing to occur "every 90 days to review the [Department's] progress . . . toward adoptive placement of the children."  *Id.*

September 20, 2017 – The court enters an order denying A.D. and L.J.'s grandparents' request for visitation.  The grandparents' visitation request was the subject of a hearing on September 6, 2017.  Several persons attended this hearing: the Department was represented by Assistant County Attorney Nancy Jones and Defendant Kathryn Joo, an adoption resource worker; the children were represented by a guardian ad litem; an attorney appeared for Quinn and another grandparent, Crystal Lundquist-Mely; and two other grandparents, Leroy Dudley and Holly Beck, also were present.  ECF No. 11-1 Ex. 7 at 77.  The court found "credible" an affidavit submitted by Hennepin County social worker (and Defendant) Patricia Doherty, and a letter from L.J.'s therapist, both "arguing that [grandparent] visitation is not in the best interests of the children."  *Id*.  The court also noted that the guardian ad litem objected to grandparent visitations.  *Id.* at 78.  After observing that the "children are state wards and the grandparents have no legal right to visitation with them," the court denied the grandparents' motions for visitation.  *Id.* at 77, 78.

*July 6, 2018 – The court enters an order granting Quinn's motion for adoptive placement, finding "no doubt that Ms. Quinn's home is the best place for these children."* ECF No. 11-1 Ex. 8 at 91.  Quinn filed her motion for adoptive placement on November 9, 2017.  *Id.* at 83.  "After Quinn filed her motion …, Defendants retaliated against her by blocking her from visiting the boys" and by conspiring with a therapist "to perform a sham 'parenting assessment,' with the sole purpose of preventing Quinn from obtaining custody."  Am. Compl. ¶ 49.  A hearing on Quinn's adoptive-placement motion occurred over three non-consecutive days in late May and early June 2018 before a Hennepin County District Court, Juvenile Division referee.  ECF No. 11-1 Ex. 8 at 80.  Quinn appeared, represented by counsel, and was one of sixteen witnesses who testified at the hearing.  *Id.* at 80–81.  The Department was represented by Assistant Hennepin County Attorney Jones and Defendants Doherty and Joo.  *Id.* at 80.  The guardian ad litem also appeared, represented by counsel.  *Id.*  Doherty, Joo, and the guardian ad litem all testified.  *Id.* at 80–81.  The Department took the position that Quinn's motion for adoptive placement should be denied; to support this position, the Department relied on a series of allegations casting Quinn in a negative light.  *Id.* at 83.  In detailed factual findings, the referee rejected the Department's position.  The referee found that several of the Department's concerns regarding Quinn's background and past behaviors were either untrue or unsubstantiated.  *Id.* at 84–85.  The referee rejected a parenting assessment conducted by a Department-retained therapist, finding that the therapist's report was not credible and that her concerns regarding Quinn's ability to care for the boys were "baseless."  *Id.* at 85–88.  The referee instead attributed greater weight to the opinions of two psychologists who

9

testified essentially that Quinn was capable of being a good parent and "a viable permanency option for the children, with therapeutic support." *Id.* at 88. In a series of legal conclusions, the referee was deeply critical of the Department's decisions to exclude Quinn from consideration as a permanency option and "to place the children in [a series of] less suitable placements than Ms. Quinn's home." *Id.* at 90; *see id.* at 89–95. The following paragraph from the referee's legal conclusions summarizes several of the referee's concerns:

> Ms. Quinn has met her burden of proving by a preponderance of the evidence that the Department was unreasonable in failing to place the children with her for adoption. The Department completely failed to consider Ms. Quinn as an adoptive placement. Neither the Department nor the Guardian ad Litem interviewed Ms. Quinn or ever visited her home. (Jenifer Quinn Testimony, Kathryn Joo Testimony; Patricia Doherty Testimony; Audrey Brown Testimony). The reasons the Department has given for excluding Ms. Quinn are baseless and/or could have been easily cleared up through minimal investigation – investigation the Department admitted it never actually conducted. (See Kathryn Joo Testimony; Patricia Doherty Testimony). The Court does not find credible Ms. Doherty's testimony that the Department has met several times to consider the best interest factors for these children as they relate to Ms. Quinn. Ms. Quinn has an approved adoption home study, a home large enough for her and the children, an unwavering commitment and deep love for the children, a demonstrated ability to raise a child with significant special needs, sufficient financial resources, a strong support network, and no criminal record. (Amy Hook Testimony; Ex. 106; Jenifer Quinn Testimony; Crystal Lundquist-Mely Testimony; Kiyanu Baker Testimony). Furthermore, she is the children's family, and the children lived with her for a significant portion of their childhood prior to their removal from Ms. Reese. (Jenifer Quinn Testimony). It is clear to the Court that a large barrier to the Department's (and the Guardian ad Litem's) willingness to seriously consider Ms. Quinn for adoptive placement is her past employment as an exotic dancer.

10

*Id.* at 91.  Based on the referee's factual findings and legal conclusions, the court entered

an order on July 16, 2018, granting Quinn's motion for adoptive placement and requiring

the Department to develop a plan and work with Quinn to transition A.D. and L.J. into her

home and to finalize Quinn's adoption of the children.  *Id.* at 95.

*Plaintiffs suffered injuries.*  These injuries are described in general terms in the

Amended Complaint to include: "economic damages, mental and emotional pain, short-

and long-term emotional injury, dignitary harm, discomfort, embarrassment, humiliation,

fear, anxiety, apprehension, sleeplessness, a generally diminished sense of personal and

family safety, increased fear of governmental authorities, and attorneys' fees and costs."

Am. Compl. ¶ 54.  Quinn in particular "suffered significant emotional distress resulting

from her inability to regularly see, provide for, and care for L.J. and A.D."  *Id.* ¶ 55.  "Her

distress was aggravated by seeing the trauma that L.J. and A.D. experienced while being

shuffled from one inadequate foster home to another."  *Id.*  "Quinn additionally incurred

economic damages associated with retaining an attorney to pursue adoptive placement and

paying therapy and medical costs for herself, L.J., and A.D. to address harms caused by

Defendants' unlawful conduct."  *Id.*  A.D. suffered a variety of adverse experiences and

consequences resulting from his foster-care placements and separation from Quinn:

> While housed at St. Joseph's Home for Children (a foster
> facility), another child attacked A.D. until L.J. intervened.  And
> during one of the foster placements, an older boy forced A.D.
> and L.J. to watch pornography—despite the fact that A.D.
> was only four years old, and L.J. was only six years old.  By
> separating Quinn from A.D., Defendants denied A.D. the
> security and attachment of a loving adult during a

developmentally significant time period. As a result, A.D. continues to have difficulty processing his emotions.

*Id.* ¶ 58. L.J. suffered comparable injuries. "During his time in foster care, [he] developed encopresis—a medical condition often resulting from severe distress." *Id.* ¶ 57. "L.J. expressed suicidal ideation during his separation from Quinn, and he has been diagnosed with post-traumatic stress disorder." *Id.*

## II

Plaintiffs seek unspecified "injunctive and declaratory relief," Am. Compl. at 28, and Defendants argue that Plaintiffs lack Article III standing to seek this prospective relief. Though an Article III challenge concerns a federal court's subject-matter jurisdiction and is appropriately evaluated under Federal Rule of Civil Procedure 12(b)(1), this distinction makes no difference here. Defendants challenge only the Amended Complaint's sufficiency and rely only on materials embraced by the pleadings, making theirs a "facial" challenge to subject-matter jurisdiction. *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015). In analyzing a facial challenge, a court "restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citations omitted).

The United States Constitution limits the subject-matter jurisdiction of federal courts to ongoing cases and controversies. *See* U.S. Const. art. III, § 2, cl. 1. "Therefore, the plaintiff's standing to sue 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'" *Steger v. Franco, Inc.*, 228 F.3d 889, 892

(8th Cir. 2000) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  "To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an 'injury-in-fact,' (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury will likely be redressed by a favorable decision."  *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  A plaintiff only has standing to seek prospective injunctive and declaratory relief when she faces an ongoing injury or a "real and immediate" threat of future injury.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–05, 107 n.8 (1983).

The Amended Complaint does not include allegations plausibly showing that Plaintiffs here face an ongoing or real and immediate threat of future injury.  The basic theory underlying Plaintiffs' claims seems straightforward: Defendants engaged in a series of actions in the past—some negligent, others purposeful and perhaps retaliatory—that prevented or made it more difficult for Quinn to associate with A.D. and L.J., to exercise her rights under Minnesota law to participate in the Hennepin County District Court proceedings concerning A.D. and L.J., and to seek custody and adoption of A.D. and L.J. Plaintiffs allege that these actions violated Plaintiffs' procedural and substantive due process rights under the federal Constitution, giving rise to Plaintiffs' § 1983 claims.  But, as the Amended Complaint makes clear, all of this is in the past.  The Amended Complaint includes no allegations suggesting that Plaintiffs face any future threat—much less a real and immediate threat—that Defendants will repeat any of these actions or engage in similar conduct.

13

Plaintiffs' say they have standing to seek prospective injunctive and declaratory relief, but their arguments are not persuasive. Plaintiffs refer to an "ongoing dispute" between them and Defendants, but neither explain how the Amended Complaint's allegations plausibly show the existence of an "ongoing dispute" nor describe facts—whether in the Amended Complaint or not—that might show the presence of any continuing controversy. *See* Pls.' Mem. in Opp'n [ECF No. 20] at 3. Plaintiffs seem to suggest that they require declaratory relief to obtain compensatory damages, but this is not correct. The issuance of declaratory (or other equitable) relief is not a prerequisite to a damages award. Plaintiffs suggest that their assertion of a *Monell* claim against Hennepin County enables them to seek injunctive relief. Not so. An individual plaintiff asserting a *Monell* claim must still show that she faces a real and immediate threat of future injury to obtain an injunction against an assertedly unlawful municipal policy. *See, e.g.*, *Swanigan v. City of Chicago*, 881 F.3d 577, 583 (7th Cir. 2018). Plaintiffs' Amended Complaint will be dismissed without prejudice for lack of subject-matter jurisdiction to the extent it seeks injunctive and declaratory relief.

III

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state

14

a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A

In Count I of their Amended Complaint, Plaintiffs assert § 1983 claims against all individual Defendants. Two predicate federal violations support these claims: one for a violation of Plaintiffs' procedural-due-process rights, and the other for a violation of Plaintiffs' substantive-due-process rights. *See* Am. Compl. at 23. In support of these claims, Plaintiffs allege that the federal "Constitution guarantees the fundamental right to protection from government interference in intimate family associations" and "the fundamental right to access/petition the courts." *Id.* ¶ 60. Plaintiffs allege that "the Constitution guarantees the right to all process that is due in connection with those rights" and that, here, this "included a grandparent's right to intervene in child protection proceedings and the opportunity to receive notice of the right to be heard at a meaningful time and in a meaningful manner." *Id.* ¶ 61. And Plaintiffs allege that the individual "Defendants deprived [them] of these rights by engaging in the conscious-shocking conduct" alleged in the Amended Complaint, and that individual "Defendants' deliberate indifference to Plaintiffs' rights were the result of Defendants' malice and/or reckless disregard." *Id.* ¶¶ 62–63.

1

"As for the Due Process Clause, standard analysis under that provision proceeds in two steps: We ask first whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).  If the plaintiff cannot identify any protected liberty or property interest of which he was deprived, "any procedural due process claim necessarily fails." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1047 (8th Cir. 2012); *see Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006) (explaining that courts do not consider what process is due unless a plaintiff has a protected liberty or property interest).

a

i

Plaintiffs identify three liberty interests of which they were deprived to support their § 1983 procedural-due-process claim.  The first is Quinn's interest in participating in juvenile protection proceedings involving A.D. and L.J., an interest Plaintiffs say was created by the "tapestry of legal provisions" in Minnesota statutes governing such proceedings.  Pls.' Mem. in Opp'n at 4.

This first argument implicates a series of rules the United States Supreme Court has identified and applied to determine whether state law creates a constitutionally enforceable liberty interest.  "A state-created liberty interest arises when a state imposes 'substantive limitations on official discretion.'" *Forrester v. Bass*, 397 F.3d 1047, 1055 (8th Cir. 2005) (quoting *Olim v. Wakinekona,* 461 U.S. 238, 249 (1983)).  To answer whether a state law

creates an enforceable liberty interest, a court must "'examine[] closely the language of the relevant statutes and regulations.'" *Id.* (quoting *Ky. Dep't of Corr. v. Thompson,* 490 U.S. 454, 461 (1989)). "'[T]he most common manner in which a State creates a liberty interest is by establishing 'substantive predicates' to govern official decision-making, and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Id.* (quoting *Thompson*, 490 U.S. at 462). In *Thompson*, the Supreme Court "'articulated a requirement that statutes and regulations must contain explicitly mandatory language, *i.e.,* specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow, in order to create a liberty interest.'" *Id.* (quoting *Thompson*, 490 U.S. at 463).

Applying these rules, the Eighth Circuit has held that Minnesota's child-welfare statutes and associated regulations "do not create a constitutional liberty interest." *Doe v. Hennepin Cnty.*, 858 F.2d 1325, 1328 (8th Cir. 1988) (citing *Myers v. Morris*, 810 F.2d 1437 (8th Cir. 1987), *cert. denied*, 484 U.S. 828 (1987)); *see also Forrester*, 397 F.3d at 1055–57 (acknowledging, based on *Myers* and *Doe*, that Minnesota child-protection statutes do not create a constitutional liberty interest, and reaching the same holding with respect to Missouri child-protection statutes). In *Forrester*, the court cited other circuit-court decisions reaching this same conclusion with respect to other child-welfare regimes. 397 F.3d at 1056–57 (citing *Sealed v. Sealed*, 332 F.3d 51, 56 (2d Cir.2003); *Doe v. Dist. of Columbia*, 93 F.3d 861, 868 (D.C. Cir. 1996); *Tony L. v. Childers*, 71 F.3d 1182, 1186 (6th Cir. 1995); and *Doe v. Milwaukee Cnty.*, 903 F.2d 499, 503–04 (7th Cir. 1990)).

On top of those child-welfare-specific holdings, the Eighth Circuit has made clear that, to the extent plaintiffs allege that violations of state procedural rules "*themselves* constitute a violation of their due process rights, this argument fails under well-established law." *Lee v. Hutchinson*, 854 F.3d 978, 981 (8th Cir. 2017) (en banc).  This is because "adopting this argument 'would conflict with a long line of Supreme Court decisions holding that a violation of state procedural law does not itself give rise to a due process claim.'"  *Id.* (quoting *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 794 F.3d 1327, 1333 (11th Cir. 2015)); *see also Domka v. Portage Cnty., Wis.*, 523 F.3d 776, 784 (7th Cir. 2008) ("Federal judges do not enforce state-created procedures in the name of the Constitution, and a failure to comply with state procedural rules does not violate the federal constitution." (quotations and citations omitted)); *Shango v. Jurich*, 681 F.2d 1091, 1100–01 (7th Cir. 1982) ("[A] state created procedural right is not itself a liberty interest within the meaning of the Fourteenth Amendment[.]"  "Constitutionalizing every state procedural right would stand any due process analysis on its head.").

Judged against these rules, Plaintiffs' assertion that Quinn possessed and was deprived of a Minnesota-created constitutionally-protected liberty interest in participating in juvenile protection proceedings involving A.D. and L.J. is implausible.  Binding Eighth Circuit precedents—*Myers* and *Doe*—pretty clearly say the opposite, and Plaintiffs do not distinguish them.  Leaving these cases aside, Plaintiffs' argument seems to be that, because Quinn was a "grandparent[] with whom the child has lived within the proceeding two years," Minnesota law mandated that she be made a "party" to the proceedings concerning A.D. and L.J., and this is enough to show the creation of a constitutionally protected liberty

interest. Pls.' Mem. in Opp'n at 4–5. This is not correct. *Hutchinson* and the other cases cited above establish that this kind of state procedural violation cannot alone support a constitutional claim. If that weren't so, Plaintiffs' position remains unpersuasive. Plaintiffs base this argument on Minn. Stat. § 260C.163, subdiv. 2(c), which provides:

> Any grandparent of the child has a right to participate in the proceedings to the same extent as a parent, if the child has lived with the grandparent within the two years preceding the filing of the petition. At the first hearing following the filing of a petition, the court shall ask whether the child has lived with a grandparent within the last two years, except that the court need not make this inquiry if the petition states that the child did not live with a grandparent during this time period. Failure to notify a grandparent of the proceedings is not a jurisdictional defect.

*See* Pls.' Mem. in Opp'n at 4–5. This statute does not establish discretion-limiting substantive predicates. It does something different. It identifies facts for judicial determination that, if found by the court, vest an individual or individuals with a right to participate in child-protection proceedings. Judicial fact-finding is by nature inherently discretionary. And if the court finds the predicate facts, the statute makes clear that the court retains the power (or jurisdiction) to proceed even if a grandparent is not notified of the proceedings. In other words, the particular outcome Plaintiffs identify—Quinn's participation in the proceedings concerning A.D. and L.J.—was not mandated under this statute in the relevant sense.[6]

---

[6] It doesn't matter to deciding whether the statute Plaintiffs rely on—Minn. Stat. § 260C.163, subdiv. 2(c)—creates a constitutional liberty interest, but Plaintiffs overstate Quinn's rights under Minnesota law. Specifically, they argue that Minn. Stat. § 260C.163 gave Quinn the rights to effective assistance of counsel (perhaps at the County's expense), to be heard, to present evidence, to cross-examine witnesses, and all other protections

ii

The second liberty interest Plaintiffs identify is their right to familial association. To support this interest, Plaintiffs argue that the Eighth Circuit, in *Whisman v. Rinehart*, 119 F.3d 1303 (1997), "recognized that … grandparents and grandchildren may have familial association rights in the context of child protection proceedings." Pls.' Mem. in Opp'n at 6.

The Supreme Court "ha[s] said that the Constitution protects 'certain kinds of highly personal relationships.'" *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 618–20 (1984)). As the court acknowledged in *Overton*: "there is some discussion in our cases of a right to maintain certain familial relationships, including association among members of an immediate family and association between grandchildren and grandparents." *Id.* (citing *Moore v. East Cleveland*, 431 U.S. 494 (1977) (plurality opinion), and *Meyer v. Nebraska*, 262 U.S. 390 (1923)); *see*

---

afforded to *parties* of juvenile protection proceedings. Pls.' Mem. in Opp'n at 4–5. This argument erroneously conflates a "participant" with a "party" under the relevant statutes and rules. *Compare* Minn. R. Juv. Prot. P. 32.02 (Rights of Parties) with 33.02 (Rights of Participants). "Party status is governed by the Minnesota Rules of Juvenile Protection Procedure," Minn. Stat. § 260C.163, subd. 2(b), and those Rules confirm that "grandparents with whom the child has lived within the two years preceding the filing of the petition" are "participants" unless they have intervened or fall into other specific categories not applicable here. *See* Minn. R. Juv. Prot. P. 33.01, 02. *Parties* to a proceeding have comprehensive rights, including the right to conduct discovery, bring motions, subpoena witnesses, and appeal. *See* Minn. R. Juv. Prot. P. 32.02. *Participants'* rights are more limited. Minn. R. Juv. Prot. P. 33.02. As a participant who had not intervened, Quinn had the right to notice, legal representation at her expense, being present at certain hearings, and offering information at the court's discretion. *Id.*

*also Harpole v. Ark. Dep't of Human Servs.*, 820 F.2d 923, 927 (8th Cir. 1987) ("Familial relationships have been protected from many forms of governmental intrusion.").

*Whisman* raised—but, as will be explained, did not decide—the question of grandparents' rights of familial association in the child-protection context. *Whisman*'s facts begin with a mother leaving her child in the care of a babysitter. 119 F.3d at 1307. The mother did not return home as planned, and the babysitter—after being told by the mother's boyfriend that the mother was "passed out drunk"—contacted a social worker. *Id.* After failing to locate the child's mother, the social worker went to the babysitter's home, examined the child, "and found him to be in good health." *Id.* Though the babysitter told the social worker that the child's grandmother was scheduled to pick up the child "around noon," the social worker directed the babysitter to hand the child over to a juvenile officer. *Id.* "The babysitter did so at approximately 11:45 a.m.," and the child was driven to a shelter some 14 miles away. *Id.* State officials denied the grandmother's repeated requests for custody. *Id.* at 1307–08. Through a series of allegedly backdated and late-filed court orders, state officials retained custody of the child for seventeen days. *Id.* at 1308. Custody was restored to the family following a hearing. *Id.* Both the child's parents and grandparents sued the social workers and juvenile officers claiming they had "violated plaintiffs' constitutional rights of familial association, denying plaintiffs due process of law." *Id.* at 1307.

The Eighth Circuit addressed whether the district court had properly denied the defendants' motion to dismiss based on qualified immunity. *Id.* at 1309. Though the court discussed the constitutional scope of the grandparents' familial interest in the society of

their grandchild, the case's qualified-immunity issue does not seem to have been decided on that basis. *Id.* at 1312.[7]  The court never reached the conclusion—essential to its qualified immunity determination—that the grandparents' right to a familial relationship with the grandchild was clearly established at the time of the violation. *Id.*; *see also id.* at 1309 (acknowledging the "clearly established" standard).[8]  The court instead determined that the defendants were not entitled to qualified immunity on the ground that the "[d]efendants' alleged actions in preventing the grandparents from petitioning the court for custody of [the child] state a cause of action for violation of their First Amendment rights [of] access to the courts." *Id.* at 1313.  This right of access, the court explained, was "clearly established" at the time of the violation. *Id.* at 1312.

This review of *Whisman*'s facts and legal reasoning shows that, at least insofar as Plaintiffs' procedural-due-process claim depends on their right to familial association, the case does not help Plaintiffs.  This case's facts are materially different. *Whisman* involved the sudden removal of a "healthy" child from a home, backdated court documents, and deliberate delays in legal proceedings intended at least to delay (and perhaps to prevent) the parents and grandparents from regaining custody. *Id.* at 1307–08.  As the court described things, "[t]here was not, under the allegations of the complaint, any reasonable

---

[7]    The court addressed the grandparents' procedural due process claim separately from the parents' claim. *Id.* at 1311–13.

[8]    The court noted that a liberty interest protected by the Fourteenth Amendment might be created where "a state statute gives specific directives to the decision maker that if the (statute's) substantive predicates are present, a particular outcome must follow," *id.* at 1312 (cleaned up), but also declined to decide the appeal on this basis.

suspicion of child abuse" like that asserted in other cases. *Id.* at 1310.  We don't have anything like *Whisman*'s facts here.  Plaintiffs do not allege that the children's initial removal from their mother's home and custody was unwarranted or improper.  Nor do they allege any facts suggesting deliberate deceit on the part of Defendants designed to delay judicial proceedings.  As to the law, *Whisman* does not support Plaintiffs' familial-association-based due process claim because it was not decided on that basis.  Nor did it identify a usable framework for assessing a grandparent's assertion of a constitutional claim grounded in the right to maintain familial relationships with grandchildren.

In the absence of binding Supreme Court or Eighth Circuit precedent, Defendants argue that whether Plaintiffs have a constitutional right to familial association should be determined by reference to several factors.  These include:

> whether the [grandparent] plaintiff is a custodial figure or is otherwise acting in loco parentis to the children; whether and for how long the children were residing with the plaintiff at the time of the alleged deprivation; whether the plaintiff has a biological link to the children; and whether there is a potential conflict between the rights of the plaintiff and the rights or interests of the children's natural parents.

*Rees v. Off. of Child. & Youth*, 744 F. Supp. 2d 434, 445 (W.D. Pa. 2010), *aff'd* 473 Fed. App'x 139 (3d Cir. 2012).  There are good reasons to evaluate Plaintiffs' claim with these factors.  The district court in *Rees* settled on these factors after carefully and thoroughly reviewing federal appellate cases from various circuits.  744 F. Supp. 2d at 445–452.  The Third Circuit recognized the thoroughness and reasonableness of this approach in affirming the district court's decision.  473 Fed. App'x at 142–43.  And Plaintiffs do not dispute the appropriateness of applying these factors here.  *See* Pls.' Mem. in Opp'n at 6.

Though it is a closer call, the better answer is that the Amended Complaint and court records it embraces do not set forth factual allegations plausibly showing the presence of these factors to a degree that gives rise to a constitutionally protected right of familial association between Quinn and the children.  Plaintiffs allege only generally that A.D. and L.J. "frequently lived with Quinn in her home, where they spent most of their time."  Am. Compl. ¶ 23.  Plaintiffs also allege that "Quinn was generally their primary caregiver, though Reese sometimes took the children away from her and occasionally threatened to keep them away."  *Id.*  When the CHIPS petition was filed, however, A.D. was in the care of his father, and L.J. was with Quinn.  ECF No. 11-1 Ex. 1 at 4.  And the incident prompting the CHIPS petition occurred while the children were in Reese's custody.  Am. Compl. ¶ 24.  Quinn does not allege facts tending to show a time period during which she cared for the children, how much time she spent caring for the children, or the degree to which she had responsibility for parenting decisions around the time of the alleged deprivation.  There is no question Quinn had a biological link to the children.  *Id.* ¶ 22.  At the same time, court records embraced by the Amended Complaint clearly show that, before Quinn was awarded custody, Reese sought to retain custody and grandparents other than Quinn participated in the child-protection proceedings and maintained custody of the children.  ECF No. 11-1 Ex. 6 at 46, 53–63; Ex. 7 at 77; and Ex. 8 at 84 (explaining that, as of June 2017, "the children were in a relative foster placement with their paternal grandparents, Kathy and Melvin Jensen").  In other words, records embraced by the Amended Complaint show, not merely a potential conflict between Quinn's rights and the rights of Reese and other grandparents, but the evident presence of actual conflicts.  The

bottom line is that, considered against these facts, the Amended Complaint's allegations do not plausibly show that Quinn enjoyed a relationship with the children of such significance as to trigger a constitutional right to familial association.

iii

The third interest Plaintiffs identify is their right of access to the courts. Pls.' Mem. in Opp'n at 6–7. The Eighth Circuit has held that "'access to the courts is a fundamental right of every citizen.'" *Whisman*, 119 F.3d at 1312 (quoting *Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1427 (8th Cir. 1986)). To show a deprivation of this interest, Plaintiffs must allege facts plausibly "show[ing] that the defendants acted with some intentional motivation to restrict [their] access to the courts." *Johnson v. Rutledge*, No. 4:21-cv-00373-KGB, 2022 WL 990277, at *10 (E.D. Ark. Mar. 31, 2022) (citing *Whisman*, 119 F.3d at 1313). Plaintiffs must also allege facts plausibly showing that they suffered an "actual injury" resulting from the asserted denial of access. *Lewis v. Casey*, 518 U.S. 343, 351–52 (1996). As with the first liberty interest Plaintiffs identified— Quinn's interest in participating in juvenile protection proceedings involving A.D. and L.J.—Defendants' violation or violations of state-created procedural rules alone cannot support this claim. *Hutchinson*, 854 F.3d at 981; *see also Gearin v. City of Maplewood*, 780 F. Supp. 2d 843, 863 (D. Minn. 2011) (describing as "dubious" the "proposition that a violation of a state procedural rule is, without more, a violation of the First Amendment right of access to courts").

The Amended Complaint's allegations do not plausibly show a violation of Plaintiffs' rights of access to the courts.[9]  A careful review of the Amended Complaint shows that Plaintiffs assert two types of allegations in support of this claim.  The first is that Defendants failed to give Quinn the notice she was entitled to receive under Minnesota statutes and rules governing child-protection proceedings.  *See, e.g.*, Am. Compl. ¶¶ 29, 30, 37, 38.  As noted, however, the law is clear that violations of state procedural rules alone cannot support Plaintiffs' constitutional claim.  The second is that Defendants made various statements and advocated various positions in the context of the child-protection proceedings that were adverse to Quinn.  *See, e.g.*, *id.* ¶¶ 2, 3, 32, 33, 39, 44, 49.  These facts do not show that Defendants interfered with Plaintiffs' right of access to the courts. They show that some Defendants advanced ill-advised positions in the course of judicial proceedings involving A.D. and L.J.'s custody.  In other words, these allegations do not show that Plaintiffs were prevented or inhibited from participating in these proceedings; they show that Plaintiffs' desired outcome from those proceedings—or at least Quinn's desired outcome—was more difficult owing to Defendants' opposition to her efforts to obtain custody of the children.  What is more, the court records embraced by the Amended Complaint show that Quinn repeatedly accessed—either through being addressed in a decision, personally appearing or participating in hearings, or bringing the motion for adoptive placement—the judicial proceedings concerning A.D. and L.J.  *See* ECF No. 11-

---

[9]      Though the right-of-access claim is brought on behalf of all three Plaintiffs, it seems focused exclusively on Quinn.  The Amended Complaint includes no allegations suggesting that A.D. or L.J. were prevented from accessing the courts.

1 Ex. 1 at 4, 5; Ex. 3 at 19; Ex. 4 at 30; Ex. 6 at 50; Ex. 7 at 77; Ex. 8.  It is difficult to understand how a right-of-access claim might plausibly be alleged in these circumstances.

b

Had Plaintiffs identified the deprivation of a constitutionally protected liberty interest, their procedural-due-process claim would remain implausible because the Amended Complaint includes no allegations showing that the extensive procedures Plaintiffs received were constitutionally inadequate.  "A procedural due process claim focuses not on the merits of a deprivation, but on whether the State circumscribed the deprivation with constitutionally adequate procedures." *Parrish v. Mallinger*, 133 F.3d 612, 615 (8th Cir. 1998).  "This inquiry examines 'the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law.'" *Id.* (quoting *Zinermon v. Burch*, 494 U.S. 113, 126 (1990)).  "Relevant factors include the affected private interest, the risk of an erroneous deprivation, the probable value of additional procedural safeguards, and the government's interest, including burdens that additional safeguards would entail." *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Accepting that Defendants (or some of them) caused Plaintiffs to experience a longer, more difficult, and more expensive adjudication regarding the children's custody, the Amended Complaint includes no allegations addressing how the state's established procedures were inadequate or how these procedures should be modified to achieve compliance with the Fourteenth Amendment's Due Process Clause.  And, as noted in the preceding section, neither the Amended Complaint nor Plaintiffs' briefing addresses the

27

court records showing that Quinn participated in many aspects of the child-protection

proceedings and that her motion for adoptive placement was granted.

2

The second § 1983 predicate Plaintiffs assert in Count I of their Amended Complaint

is for a violation of their substantive-due-process rights.    As the Eighth Circuit has

explained:

> In addition to its procedural protections, the Due Process
> Clause protects individual liberties from government action
> "regardless of the fairness of the procedures used to implement
> them." *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th
> Cir. 2010) (internal quotation marks omitted).    To state a
> substantive due process claim against a state official, a plaintiff
> must demonstrate that a fundamental right was violated and
> that the official's conduct shocks the conscience. *Folkerts v.
> City of Waverly*, 707 F.3d 975, 980 (8th Cir. 2013).    Whether
> conduct shocks the conscience is a question of law.    *Id.*
> Conscience shocking conduct only includes "the most severe
> violations of individual rights that result from the brutal and
> inhumane abuse of official power." *White v. Smith*, 696 F.3d
> 740, 757–58 (8th Cir. 2012) (quotation marks omitted).    "Only
> a purpose to cause harm *unrelated to the legitimate object
> of* the government action in question will satisfy the element of
> arbitrary conduct shocking to the conscience, necessary for a
> due process violation." *Folkerts*, 707 F.3d at 981 (cleaned up).

*Mitchell v. Dakota Cty. Soc. Servs.*, 959 F.3d 887, 898 (8th Cir. 2020).    "The theory of

substantive due process is properly reserved for truly egregious and extraordinary cases,

and it proscribes certain government actions regardless of the fairness of the procedures

used to implement them." *Zakrzewski v. Fox*, 87 F.3d 1011, 1014 (8th Cir. 1996) (cleaned

up).

The Amended Complaint does not allege conscience-shocking conduct.  At most, it alleges that Defendants failed to give notice required under Minnesota law and advanced positions that lacked support (and ultimately were not accepted by the Hennepin County District Court).  If Plaintiffs meant to identify some specific aspect of Defendants' conduct as conscience-shocking, that is not clear from the Amended Complaint.  Count I refers generally to "the conscience-shocking conduct alleged above" without pointing out what particular conduct described in the pleading's preceding paragraphs is alleged to be conscience-shocking.  Plaintiffs are more specific in their opposition brief.  There, Plaintiffs say they "are not asserting harm on the basis of official's discretionary judgment in removing the boys, placing them in unsuitable foster homes, or any harm to the boys that came from those foster homes."  Pls.' Mem. in Opp'n at 15.  Instead, Plaintiffs say their substantive-due-process claim "rest[s] on the . . . denial of automatic party status, continued denial of notice, and purposeful misrepresentations."  *Id.* at 16.  No case, however, has been cited or found to support the idea that these types of activities might plausibly be conscience shocking.

B

In Count II of the Amended Complaint, Plaintiffs assert a claim against Hennepin County under *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  *Monell*'s basic rule is "that civil rights plaintiffs suing a municipal entity under 42 U.S.C. § 1983 must show that their injury was caused by a municipal policy or custom."  *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 30–31 (2010).  In other words, a municipality cannot be held liable under § 1983 because it employed a tortfeasor, but it may "be sued directly under §

29

1983 for monetary, declaratory, or injunctive relief . . . [only if] the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690.  Municipalities also "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690–91.  Thus, the "first inquiry in any case alleging municipal liability under § 1983 is . . . whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

Plaintiffs do not allege a plausible *Monell* claim against Hennepin County. Plaintiffs have not alleged plausible § 1983 claims against the individual Defendants, and their *Monell* claims are derived from the individual claims.  In other words, apart from the individual Defendants' actions, Plaintiffs identify no separate theory or unconstitutional policy for which the county is responsible.  Leaving that problem aside, Plaintiffs do not allege facts plausibly showing that the omission of grandparents from juvenile protection proceedings occurs often or results from an official policy or custom.  The complaint generally references "similarly situated" families or individuals and the "categorical exclu[sion] of grandparents" from child-protection proceedings as bases for the *Monell* claim.  Am. Compl. ¶¶ 52–53, 67–68.  But Plaintiffs' specific allegations relate only to Plaintiffs' experience.  This isolated event does not establish a custom.  *See Hunziker as Tr. for ALH v. Doherty*, No. 20-cv-2188 (NEB/TNL), 2021 WL 3146529, at **4–5 (D. Minn. July 26, 2021) (recognizing that "an isolated incident of alleged misconduct does

30

not establish a municipal custom").  And to the extent Plaintiffs allege that Hennepin County's CHIPS petition template demonstrates a custom of unconstitutional omissions, the template includes all relevant elements listed in Minn. Stat. § 260C.141, subd. 5.  *See* ECF No. 10 at 23; ECF No. 22 at 8.

## C

As for Plaintiffs' remaining state-law negligence claim in Count III, a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Barstad v. Murray Cnty.*, 420 F.3d 880, 888 (8th Cir. 2005) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)).  And the Eighth Circuit has instructed district courts not to exercise supplemental jurisdiction over state-law claims when, as here, all federal claims are dismissed well before trial.  *See Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 726–27 (8th Cir. 2008).  There is no reason to deviate from this general rule here.

*

Plaintiffs have not requested leave to amend the Amended Complaint in the event Defendants' motion is granted, and Plaintiffs have identified no additional allegations they might make to address the pleading deficiencies identified above.  In this situation, it makes better sense to dismiss Plaintiffs' § 1983 claims with prejudice.  *See Mell v. Minn. State*

*Agric. Soc'y*, 557 F. Supp. 3d 902, 924 (D. Minn. 2021).  Plaintiffs' negligence claim will be dismissed without prejudice so that Plaintiffs may pursue that claim in state court.

**ORDER**

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.      Defendants' motion to dismiss [ECF No. 8] is **GRANTED**.

2.      Counts I and II of Plaintiffs' Amended Complaint are **DISMISSED WITH PREJUDICE**.

3.      Count III of Plaintiffs' Amended Complaint is **DISMISSED WITHOUT PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October 31, 2022                    s/ Eric C. Tostrud
                                           Eric C. Tostrud
                                           United States District Court